IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DEMARKEE JIMERSON,<br><br>Defendant. | Case No. 21–CR–30131–SPM |

MEMORANDUM AND ORDER

**McGlynn, District Judge:**

Before the Court is defendant Demarkee Jimerson's Motion to Suppress Statements and Searches (Doc. 65). Jimerson contends that his statements, both on scene and at the station, should be suppressed even though he had been given his *Miranda* rights. Jimerson further contends that any evidence seized during execution of a search warrant that was obtained after his statements were made and after a protective sweep were conducted should also be suppressed.

Although Jimerson requested an evidentiary hearing, one is not necessary in this case. In order to obtain an evidentiary hearing, Jimerson bears the burden of making a prima facie case of illegality. *United States v. Randa*l, 966 F.2d 1209, 1212 (7th Cir. 1992). Furthermore, courts are required to hold an evidentiary hearing only when "a substantial claim is presented" and "there are disputed issues of fact that will affect the outcome of the motion". *United States v. Curlin,* 638 F.3d 562, 564 (7th Cir. 2011).

There are no disputed issues of fact in this case. Moreover, Jimerson has not

introduced any evidence that contradicts the surveillance, audio, or video recordings submitted by the government. For the reasons set forth below, Jimerson's motion to suppress is **DENIED**.

## PROCEDURAL AND FACTUAL HISTORY

On July 26, 2021, the United States filed a two-count criminal complaint against Jimerson (Doc. 1). Count 1 charged possession with intent to distribute controlled substance: cocaine base, while count 2 charged felon in possession of firearm (*Id.*). An Affidavit from DEA/TFO Timothy Birckhead was attached to the complaint and set forth the following bases for these offenses[1]:

> The investigation into Jimerson began in April of 2021 after officers received information from a confidential source ("CS1") that advised that he/she had purchased marijuana, crystal methamphetamine, and cocaine from Jimerson. CS1 further advised that Jimerson was supplied by a female from California who transported the drugs via commercial airlines to Jimerson. CS1 also advised that Jimerson used the alias "Aaron Gregory" because he had an outstanding arrest warrant in Missouri for a parole violation.
>
> A second confidential source, ("CS2), also provided information on Jimerson and advised that he/she had purchased marijuana and fentanyl from Jimerson. On April 19, 2021, a recorded meeting was conducted between CS2 and Jimerson regarding the purchase of crystal methamphetamine.
>
> Visual surveillance began in April of 2021 of the residence at 33 David Street, Cahokia and officers noticed activity indicative of illegal drug sales, including the frequency of short visits to the residence by numerous people and on a regular basis. Several of these individuals had previous convictions for drug related offenses and many were documented on surveillance as arriving at the residence empty-handed and leaving with what appeared to be full trash bags or grocery bags.
>
> On two occasions, June 16, 2021 and June 24, 2021, a group of females, one later identified as Melissa Michael ("Michael"), were seen arriving

---

[1] The Affidavit has been summarized.

with large suitcases and departing within one day with the same large suitcases. Following the departure of the females, the activity at Jimerson's residence increased for several days.

On July 9, 2021, CS2 contacted Jimerson and inquired about crystal methamphetamine and was told he was no longer selling crystal methamphetamine but was selling fentanyl.

On July 22, 2021, officers learned Michael and the other couriers were flying from Las Vegas, NV to St. Louis, MO and she was observed at Lambert-St. Louis Airport. Michael and the couriers had several large suitcases and were picked up by Jimerson and taken back to 33 David in Cahokia. On July 23, 2023, another courier with a large suitcase was picked up at Lambert by Jimerson and taken to 33 David in Cahokia.

On July 24, 2021, officers began conducting physical and electronic surveillance of Jimerson's residence at 33 David and observed several vehicles arriving and departing shortly thereafter, which were presumed to be drug sales.  At approximately 3:30 p.m. that same date, Jimerson and the 3 suspected couriers were seen exiting his residence with 6 large suitcases. The suitcases were loaded into the back of a waiting Uber when officers approached and took Jimerson and the 3 suspected female couriers and another male into custody. The females consented to a search of the baggage and an estimated $40,000 in US currency was discovered and seized.

Outside the residence, officers smelled an overwhelming odor of marijuana coming from the residence. Agents also observed a firearm in plain view from the front door.

Jimerson was provided his Miranda warnings and admitted there were several pounds of marijuana inside the residence along with a firearm in the front room. He also admitted to being a convicted felon and being aware of an active parole warrant.

Jimerson declined several requests to consent, so a search warrant was obtained by Magistrate Judge Sison. As a result of the warrant, agents located 10 firearms throughout the residence and inside a safe. Agents also located dozens of vacuum sealed bags containing an estimated 50 pounds of marijuana and numerous empty, large, hard-shelled suitcases. Within the safe, officers, also located additional US currency and 2 clear plastic bags containing approximately 88 grams of an off-white substance that field tested positive as containing a cocaine base.

A subsequent audio-video interview was conducted at the Fairview

Heights Police Department. Following Miranda warnings, Jimerson admitted to being the sole occupant of his residence and said anything in the house was his responsibility. He also admitted to having a false identity to avoid apprehension for his active parole warrant. A search of his personal belongings showed 2 fraudulent identification cards in the name of "Aaron Gregory" with Jimerson's photograph, along with several debit/credit cards.

On August 18, 2021, the Grand Jury issued a four-count indictment, charging defendant with one count of Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances: Cocaine Base and Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii); one count of Possession with Intent to Distribute Controlled Substance: Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii); one count of Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) and, one count of Possession of a Firearm in furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Doc. 171). The charges all referenced July 24, 2021 (*Id.*).

On August 15, 2023, defendant, by his third attorney, filed a motion to suppress the statement made by Jimerson while at 33 David Street, the statement made by Jimerson at the police department, the "protective sweep" conducted at 33 David, and the search warrant (Doc. 65). Defendant was initially represented by the Office of the Public Defender; however, on March 4, 2022, retained counsel entered after defendant complained about the handling of his case (Docs. 31, 37). His retained counsel withdrew on July 5, 2023 following a request from defendant, resulting in his retaining present counsel (Doc. 56, 63).

On September 11, 2023, the government filed its response to the aforementioned motion to suppress and included the search warrant as Exhibit A

(Docs. 71, 71-1). On that same date, the government also manually filed copies of the surveillance video, the on-scene audio interview, and the subsequent audio-video interview (Doc. 72).

## LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." In order to "compel respect for the constitutional guaranty," the Supreme Court of the United States created the exclusionary rule. *Davis v. United States*, 564 U.S. 229, 236 (2011) (citing *Elkins v. United States*, 364 U.S. 206, 217 (1960)). When applicable, that rule forbids the use of evidence obtained by police officers in violation of the Fourth Amendment. *Davis*, 564 U.S. at 231-32.

A motion to suppress seeks to exclude evidence obtained in violation of a defendant's constitutional rights. In *Simmons v. United States*, the Supreme Court explained, "[i]n order to effectuate the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, this Court long ago conferred upon defendants in federal prosecutions the right, upon motion and proof, to have excluded from trial evidence which had been secured by means of an unlawful search and seizure." 390 U.S. 377, 389 (1968). However, the exclusionary rule does not always apply in cases where a search violated the Fourth Amendment *Id.*

The Supreme Court has declared that exclusion "has always been our last resort, not our first impulse." *Herring v. United States*, 555 U.S. 135, 140, (2009) (citing *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go

free." *Id.* (citing *United States v. Leon*, 468 U.S. 897, 908 (1984)). Ultimately, the Court has "repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation." *Id.*

## ANALYSIS

This Court will analyze each of Jimerson's arguments, beginning with the two statements (on-scene audio interview and audio-visual interview conducted at the station), moving on to the protective sweep, and concluding with the issuance of the search warrant and items seized during its execution, to determine whether any of evidence and/or statements should be suppressed.

### 1. Statements

Jimerson seeks to have his statements suppressed and argues that neither of his statements made to law enforcement were made knowingly and voluntarily (Doc. 65). To the contrary, the government points out that defendant was *Mirandized* and that both statements were given voluntarily (Doc. 71).

#### a. Law

In 1966, the Supreme Court heard the seminal case of *Miranda v. Arizona* and held that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. 348 U.S. 436, 444 (1966). Specifically, the Supreme Court determined that prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. *Id.*

A defendant's challenge to the admission of statements made during a custodial interrogation presents two separate questions: whether he received and validly waived his *Miranda* rights, and whether his statements themselves were voluntary. See *Missouri v. Seibert*, 542 U.S. 600, 608–09 (2004); *Dickerson v. United States*, 530 U.S. 428, 444 (2000) ("The requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness inquiry."); *Henderson v. DeTella*, 97 F.3d 942, 946 (7th Cir. 1996).

The first question stems from the obligation that law enforcement, at the outset of a custodial interrogation, convey *Miranda* warnings—a prophylactic requirement designed to safeguard a suspect's Fifth Amendment privilege against self-incrimination—and secure a waiver of those rights. See *Miranda v. Arizona*, 384 U.S. 436, 467 (1966); *Dickerson*, 530 U.S. at 432–35, (recounting the historical development of the *Miranda* rule). A defendant can waive his *Miranda* rights and agree to speak to the authorities as long as the waiver is "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and is made knowingly and intelligently, "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

The second question is broader and asks whether, in the totality of the circumstances, the defendant's statements to authorities were voluntary. See *Mincey v. Arizona*, 437 U.S. 385, 398 (1978) ("[A]*ny* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law."). A confession will be deemed involuntary if police obtained the statement through coercive means that

overcame the defendant's free will. See *Colorado v. Connelly*, 479 U.S. 157, 164–65, (1986).

These two inquiries are deliberately distinct. Indeed, "*Miranda*'s procedural safeguards exist," the Supreme Court has emphasized, "precisely because the voluntariness test is an inadequate barrier when custodial interrogation is at stake" for ensuring that inculpatory statements admitted as evidence were the product of free choice. *J.D.B. v. North Carolina*, 564 U.S. 261, 281 (2011). Putting these two questions together, "a valid waiver of *Miranda* rights is necessary before a custodial statement may be admitted," but is not sufficient because "a statement may still be found involuntary under the totality of the circumstances even though the waiver was valid." *United States v. LeShore*, 543 F.3d 935, 941 (7th Cir. 2008); see also *Miller v. Fenton*, 474 U.S. 104, 106 (1985) (recognizing that coercive interrogation techniques may have rendered a confession involuntary notwithstanding a valid *Miranda* waiver).

Likewise, the failure to comply with *Miranda*'s prescription may require the exclusion of incriminating custodial statements that are otherwise voluntary. See *Oregon v. Elstad*, 470 U.S. 298, 306–07 (1985). In the end, then, the prosecution must prove *both* a valid *Miranda* waiver *and* the voluntariness of the resulting confession by a preponderance of the evidence. See *Seibert*, 542 U.S. at 608 n.1.

The test for voluntariness asks, "Is the confession the product of an essentially free and unconstrained choice by its maker?" *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). In response to that question, the Seventh Circuit has answered that "[a] confession is voluntary if in light of the totality of circumstances, it was not secured through psychological and physical intimidation but rather was the product of a

rational intellect and a free will." *United States v. Ceballos,* 302 F.3d 679, 694 (7th Cir.2002) (internal quotation marks omitted). In other words, courts must look at whether a defendant was read his Miranda rights, his age, the length and nature of the questioning, and whether there was any physical punishment. *Id.* "Trickery, deceit, even impersonation do not render a confession inadmissible … unless government agents make threats or promises." Furthermore, promises, particularly honest ones, to bring cooperation by the defendant to the attention of prosecutors do not render a confession involuntary. See *United States v. Dillon,* 150 F.3d 754, 758 (7th Cir.1998); *United States v. Westbrook,* 125 F.3d 996, 1005–06 (7th Cir.1997).

### b. Discussion

There is no question that Jimerson was provided his *Miranda* warnings on two separate occasions, both before his on-scene audio statement and before his audio-video statement conducted at the Fairview Heights Police Department[2]. In fact, defendant conceded that *Miranda* was read to him before each interview (Doc. 65, p.3). Instead, Jimerson contends that he did not understand his Constitutional rights such that his resulting statements were not made knowingly and/or voluntarily (*Id.*, p. 5).

### i. On Scene Audio Interview

At the time of this incident, Jimerson was in his early 40's. He was *Mirandized* at 3:28, which was just 3 minutes after officers arrived at the residence. The officer was interrupted while giving Miranda, but instead of trying to continue, he started over so some of the warnings were even given twice. Jimerson admitted to having a

---

[2] This Court has reviewed Exhibit C, the Audio Interview of Jimerson conducted on scene on July 24, 2021, as well as Exhibit D, the Audio-Video Interview of Jimerson conducted at the Fairview Heights Police Department (Docs. 72).

parole warrant out of Missouri; he even had a false name and identification in that name to evade arrest. He was taking care of his son because his mom went to jail. Given Jimerson's savviness in "becoming" someone else and the fact that this was not his first police encounter, this Court finds it highly unlikely that he did not understand the serious nature of his situation or the *Miranda* warnings provided.

While it is true that Jimerson repeatedly mentioned his son and was concerned about who would be taking care of him while he was with the police, it is also true that Jimerson repeatedly denied consent to search his residence. He also had a difficult time identifying his "friends" by name and where they came from. The officers requested cooperation and expressed the obstacles in obtaining a search warrant, but Jimerson remained steadfast in his denial to consent while admitting to being aware of the arrest warrant, to having false documents, to smoking "weed", and to having drugs in the house. In fact, he admitted that everything in the house, which may include a firearm and probably included drugs, was his responsibility since he rented the home.

The officers remained on scene with Jimerson and allowed him the opportunity to call his mother on two separate occasions and his daughter, in order to find someone to care for his son. The officers did express concern for the son being in the heat and Jimerson did consent to them obtaining water from the kitchen for him. The officers did not make any threats about his son nor did they use the son to manipulate Jimerson into making any statement. Again, Jimerson had the wherewithal to repeatedly deny consent to search the residence. Based on the foregoing, this Court has no concerns about the voluntariness of this statement. As such, the motion to

suppress this statement is DENIED.

### ii. Audio-Video Station Interview

Before the second interview, Jimerson was provided a copy of the search warrant that had been executed on the 33 David Street residence and was told that the residence had been turned over to his daughter who was taking care of his son. During this interview, Jimerson even thanked the officers for letting "his kid get his son."

Jimerson was *Mirandized* again, and as seen on video, did not display any outward signs of distress or physical punishment. When asked about the search warrant, Jimerson indicated they probably found some weed and some guns, and since they searched the safe, they probably found more guns. Jimerson told the officers that he lived in the home at 33 David Street with his son, so it was safe to say that the stuff in the house presumably belonged to him. He also admitted that he knew about the arrest warrant and that "laid low" to avoid arrest, and used the documents someone just sent him in the fake name. Jimerson admitted to dealing with the law before and said he had been trying hard to clean up.

The weed in his home comes from all over the United States and is legal. Jimerson knows a lot of farmers. As for the safe, Jimerson denied any knowledge of ecstasy and could not recall last time he was in the safe, be it days, months, or years. He did not want to talk about anyone else or blame anybody else though, and said, "they didn't have anything to do with it." Instead, he said, "My fuck-ups is my fuck ups." Although everything may not have been his, since he rented the house, it was no one else's fault and he did not want to put anything on anyone else.

This Court has no concerns that the station interrogation violated Jimerson's due process rights. In fact, out of an abundance of caution, he was given his *Miranda* warnings for a second time. As stated previously, this was not his first encounter with law enforcement and he repeatedly admitted that "it was his fuck up." Additionally, there was no evidence of coercion, threat, intimidation, or deception. Based upon the totality of the circumstances, the motion to suppress the station statement is DENIED.

### 2. Protective Sweep

#### a. Law

Warrantless searches and seizures within a home violate the Fourth Amendment's prohibition against unreasonable searches and seizures unless they fall into one of the numerous exceptions, including protective sweeps. *Kentucky v. King,* — U.S. —, 131 S.Ct. 1849, 1856 (2011). A protective sweep is a quick and limited search of premises conducted to protect the safety of police officers or others. *Maryland v. Buie,* 494 U.S. 325, 327 (1990). Under certain circumstances, a protective sweep is permissible because legitimate governmental interests outweigh an individual's interest in the protection of the Fourth Amendment. *Id.* at 331.

In general, the Fourth Amendment permits a protective sweep "if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officers of others." *Id.* at 327. The sweep must also be justified more than a "mere inchoate and unparticularized suspicion or hunch," regarding the danger. *Buie,* 494

U.S. at 332; *U.S. v. Tapia,* 610 F.3d 505, 510 (7th Cir. 2010). The search must be cursory, lasting no longer than is necessary to dispel the reasonable suspicion of danger. *Buie,* 494 U.S. at 335–36; *Tapia,* 610 F.3d at 510. It must also be limited to a cursory visual inspection of places where a person might be hiding. *Buie,* 494 U.S. at 327, 110 S.Ct. 1093; *Tapia,* 610 F.3d at 510. The inquiry is an exceptionally fact-intensive one in which we must analyze myriad factors including, among other considerations, the configuration of the dwelling, the general surroundings, and the opportunities for ambush. *United States v. Burrows,* 48 F.3d 1011, 1016 (7th Cir.1995).

### b. Discussion

Jimerson argues that the "protective sweep" rule cannot justify the warrantless invasion of the residence at 33 David Street after his arrest because there was no objectively realistic threat (Doc. 65). Specifically, Jimerson points out that he was under arrest, handcuffed and had nowhere to go when law enforcement conducted the sweep. Additionally, Jimerson points out that the residence had been under surveillance for nearly ten hours, so officers should have known of the comings and goings of everyone entering and leaving the residence. However, this Court disagrees with Jimerson's simplified rationale. The mere fact that Jimerson was in custody does not obviate the need for a protective sweep. Indeed, Jimerson's custodial status does not mean all other potential threats are dispelled.

In this case, there were many factors that would allow a reasonable officer to conclude that he, his fellow officers, or a bystander could face danger. First, the officers had information from two separate sources, which was corroborated from the surveillance that drugs were potentially being sold from the residence, not to mention

the "overwhelming" odor of marijuana. Second, officers could not know if anyone else was present in the home from the 10 hours prior to the surveillance nor could they verify that all persons present in the home exited upon instruction. Third, a child had been in the home. The officers could not know if other children were in the residence. Fourth, a handgun was observed in plain view on a coffee table right inside the front door. There is no question that guns and drugs do not mix.

Moreover, the search itself was short[3], cursory and limited to only those places where a person might be hiding. The officers entered the home within seconds of detaining Jimerson and observing both a handgun inside the residence and a young boy being brought out of the home. Additionally, the search was completed while Jimerson was still on scene and the officers did not take anything from the home during this sweep, not even the gun that was observed in plain sight.

This Court finds no Fourth Amendment implications. Such specific and articulable facts are more than sufficient to warrant a protective sweep of the house. Indeed, it was conceivable that potentially dangerous persons[4] could have been in the home and it was reasonable for officers to have concerns. Accordingly, the motion to suppress the protective sweep is DENIED.

### 3. Search Warrant

Jimerson's final argument involves the search warrant that was ultimately issued by Magistrate Judge Gilbert Sison. Jimerson contends that the warrant

---

[3] Officers entered the residence at 3:26:51 and exited the home approximately 6 minutes later, at 3:32.49.
[4] In fact, the Search Warrant indicates that a protective sweep of the residence was conducted "due to the fact that one of the females was not present with the other five individuals who came outside" (Doc. 71-1, ¶51).

violated his rights under the Fourth Amendment because it was not supported by probable cause (Doc. 65). Moreover, Jimerson raises the "fruit of the poisonous tree doctrine" and contends that all items seized during execution of said must be suppressed (*Id.*). Again, this Court disagrees with his reasoning.

### a. Law

The Fourth Amendment provides "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation ...." Probable cause for a search warrant is established when, considering the totality of the circumstances, there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Carswell*, 996 F.3d 785, 791 (7th Cir. 2021) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

The task of the issuing judge is to make a "practical, commonsense" decision whether, in light of the facts in the affidavit, there is a fair probability that contraband or evidence of a crime will be discovered in a particular place. *U.S. v. Koerth,* 312 F.3d 862, 866 (7th Cir. 2002) (quoting *Gates*, 462 U.S. at 238). The judge is entitled to draw reasonable inferences about where evidence is likely to be kept and must conclude only that it would be reasonable to seek the evidence in the location identified in the affidavit. *Koerth,* 312 F. 3d at 867.

### b. Discussion

Jimerson contends that there was insufficient probable cause for the issuance of a search warrant and cites to the "illegal protective sweep" to support this contention; however, this Court upheld the protective sweep and disagrees with Jimerson's argument. As such, this court has no concerns that Magistrate Judge Sison had

probable cause to issue the search warrant.

While this investigation began after the police received confidential statements from the two informants, the investigators corroborated those tips. Indeed, the investigators did not first seek a warrant, instead, they opened up this case.

As set forth in the "Probable Cause" statement[5], the investigation was based on information developed from a confidential source ("CS") in April of 2021, but that was just the beginning (Doc. 71-1). A confidential defendant ("CD") also provided information of large purchases made from defendant and advised that defendant travelled between Las Vegas, Nevada and the 33 David residence in Cahokia to supply the drugs. The investigators verified that defendant had an outstanding arrest warrant for a drug related offense.

Based upon this information, the investigators began surveillance and verified the tips - observing unusual activity around the home, with people coming and going from the residence at 33 David, some of whom arrived with large suitcases and stayed for short periods of time and others coming empty handed and leaving with bags. Officers also observed communications between the confidential source and defendant, hearing him discuss what he could obtain and the various price quotes.

On July 24, 2021, agents approached Jimerson and 5 other individuals outside the Cahokia residence. The agents observed an overwhelming odor of cannabis coming from the residence. Jimerson was placed under arrest – he had an outstanding arrest warrant. The other individuals gave consent to search their suitcases, and agents located approximately $40,000 in U.S. currency.

---

[5] The Search Warrant was attached to the government's response to Motion to Suppress (Doc. 71-1).

Officers then conducted a protective sweep of the residence because a female who was previously observed entering the residence was not present and because they had observed a handgun on a coffee table in plain view. During this sweep, officers observed 3 additional handguns and a rifle in plain view, along with marijuana throughout the residence.

Officers interviewed Jimerson on scene, and he admitted to the firearm in the front room along with pounds of marijuana inside the residence. One of the females also admitted to seeing a gun and marijuana inside the residence.

As set forth *infra*, probable cause exists when the supporting affidavit presents a total set of circumstances which create a "fair probability" that a search will uncover evidence of a crime. *Gates,* 462 U.S. at 238. In this case, based upon the totality of the circumstances, Magistrate Judge Sison had more than a "substantial basis" for concluding there was probable cause. Indeed, there were tips from the CS and CD, which were corroborated by the surveillance. Additionally, defendant had an outstanding arrest warrant and criminal history of a crime[6]. Furthermore, officers smelled the overwhelming odor of marijuana and observed a handgun in plain sight, as well as seeing four additional weapons and marijuana within the residence during the protective search. Accordingly, the Court denies to suppress the search warrant and does not need to consider whether a good-faith exception to exclusionary rule applies.

---

Such prior convictions will not by themselves establish probable cause for a search today, but those prior convictions can be relevant and "retain some corroborative value." *United States v. Olson*, 408 F.3d 366, 372 (7th Cir. 2005); see also *United States v. McDuffy*, 636 F.3d 361, 364 (7th Cir. 2011) (prior drug convictions not dispositive but relevant and entitled to some weight in casting doubt on any innocent explanations for the marijuana trace in trash, a currency handoff, and a stream of visitors to suspect's home).

## CONCLUSION

For the reasons set forth above, the Court **DENIES** Defendant Demarkee Jimerson's Motion to Suppress in its entirety.

**IT IS SO ORDERED.**

**DATED: October 16, 2023**

/s/ Stephen P. McGlynn<br>
**STEPHEN P. McGLYNN**<br>
**U.S. District Judge**